UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
ARTURO TOLENTINO, *pro se*      :
                                :
                   Plaintiff,   :     **MEMORANDUM & ORDER**
                                :
         -against-              :     03-CV-6175 (DLI)(LB)
                                :
JENNIFER MITCHELL, M.D., Medical Physician :
at Arthur Kill Correctional Facility; and :
J. KAPLAN, M.D., Medical Physician at Arthur :
Kill Correctional Facility,     :
                                :
                   Defendants.  :
---------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

Plaintiff brings this action, *pro se*, pursuant to 42 U.S.C. § 1983, alleging that defendants failed to provide him adequate medical care during his incarceration at Arthur Kill Correctional Facility ("Arthur Kill"). Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56. By order dated July 1, 2005, this court referred the motion to U.S. Magistrate Judge ("MJ") Lois Bloom who issued a Report and Recommendation ("R&R"), dated March 31, 2006, recommending dismissal of this action.[1] After a *de novo* review of those portions of the R&R to which Tolentino objects, *see* Fed. R. Civ. P. 72 (b); 28 U.S.C. § 636(b), this court adopts Judge Bloom's R&R in its entirety.

**Background**

*Pro se* plaintiff Tolentino filed this Section 1983 (42 U.S.C. § 1983) action alleging constitutional violations, including the Eighth and Fourteenth Amendments of the U.S. Constitution. (*See* Am. Compl. ¶¶ 12-17.) Specifically, plaintiff claims that while incarcerated at Arthur Kill,

---

[1] Familiarity with M.J. Bloom's R&R is assumed.

defendant Mitchell was deliberately indifferent to plaintiff's medical condition when plaintiff reported to Arthur Kill's "emergency sick call" on June 4, 2003. (*See* Am. Compl. ¶ 10.) Plaintiff further alleges that defendant Kaplan caused plaintiff to suffer a hypertensive crisis when Kaplan improperly administered the drug Epogen to plaintiff. (*See* Am. Compl. ¶ 7.) Moreover, plaintiff alleges that defendants Mitchell and Kaplan "failed to properly and routinely monitor plaintiff's response to [] Epogen, despite the well-known dangers posed by its use." (*See* Am. Compl. ¶ 8.)

Plaintiff suffers from End Stage Renal Disease ("ESRD") and underwent dialysis treatment approximately three times a week at Arthur Kill. *(See* Pl's Dep. at 14, 109, 121.) Nephrologists, Defendant Kaplan and Dr. Saggi supervised Plaintiff's dialysis treatment at Arthur Kill. (*See* Stern Decl. at ¶ 6.) As a result of muscle cramps and fatigue, plaintiff decided to end his dialysis treatments before the scheduled conclusion. (*See* Pl's Aff. at ¶¶ 5, 7.) Upon termination of his dialysis treatments, plaintiff signed an acknowledgment informing him of the medical risks, associated with premature termination of dialysis. (Kaplan Decl. at ¶ 14; Mitchell Decl. Ex. B.) Among the risks is hypertension. (*Id.*)

In conjunction with dialysis, plaintiff was administered Epogen, a drug used to prevent anemia in dialysis patients. (Pl.'s Dep. at 70-73; Kaplan Decl. at ¶ 12.) A side effect associated with Epogen is hypertension. (Pl.'s Aff. Ex. C.) In an attempt to manage his hypertension, plaintiff's dosage of Epogen was routinely reviewed and adjusted, sometimes reduced or "held" altogether. (*See* Kaplan Decl. at ¶ 13; Kaplan Decl. Ex. A at 59; Kaplan Decl. Ex. A at 188.)

Plaintiff's medical records reveal that Plaintiff was not compliant with fluid and dietary restrictions imposed by his medical providers. (*See* Kaplan Decl. at 21, 25, 27, 29.) In addition, plaintiff often had difficulty remembering to re-order his hypertension medication and often

indicated that he was out of blood pressure medication during his post-dialysis consultations. (*See* Kaplan Decl. at 21.) The medical records further reveal that plaintiff experienced excessive weight gain between dialysis sessions and that his blood pressure was often uncontrolled. (*See* Kaplan Decl. at 21, 27.)

On June 4, 2003, at approximately 7:40 a.m., plaintiff reported to "emergency sick call" complaining of numbness in his right side and arm area, vomiting and severe headaches. (Pl.'s Am. Compl. ¶ 5; Mitchell Decl. Ex. A at 14.) Plaintiff's blood pressure was checked upon his arrival and two times thereafter.[2] (Mitchell Decl. Ex. A at 14-15.) Mitchell directed the resident nurse to give plaintiff Catapres, a medication used to treat hypertension. (*Id.*) At approximately 10 a.m., plaintiff was found on the floor of the emergency room where he vomited. (Mitchell Decl. Ex. A at 15.) Medical personnel called 911 and administered sublingual nitroglycerin and oxygen. (*Id.*) When EMS personnel arrived, plaintiff claimed he was "alright" and refused to get in the ambulance. (*Id.*) Plaintiff was placed in the infirmary for further observation.

At approximately 11:20 a.m., plaintiff suffered a grand mal seizure and was taken to the Staten Island Hospital. (*Id.*) Plaintiff was diagnosed with hypertensive crisis. (Mitchell Decl. Ex. A at 43-44.) Defendant Kaplan examined plaintiff during his hospitalization on June 4 and June 5, 2003. (Kaplan Decl. at ¶ 17.) During the examinations, Kaplan questioned plaintiff concerning plaintiff's compliance with the prescribed fluid and dietary restrictions and anti-hypertensive medication. (*Id.*) Kaplan noted during the exam that plaintiff's significant weight gain during dialysis contributed to the hypertensive crisis. (*Id.*) Plaintiff was discharged and returned to Arthur

---

[2] Plaintiff's blood pressure was checked at 7:40 a.m., 8:50 a.m. and 9:30 a.m. His blood pressure was found to be 194/130, 230/150 and 200/140 respectively. (*See* Mitchell Decl. Ex. A at 14-15.)

Kill on June 5, 2003. (Kaplan Decl. at ¶18.) Kaplan recommended that plaintiff continue taking his medications, except Epogen, which should be withheld until plaintiff's blood pressure was better controlled. (*Id.*)

On June 7, 2003, plaintiff was re-admitted to Staten Island Hospital for hypertension and released on June 12, 2003 after his blood pressure stabilized. (Mitchell Decl. Ex. A at 51.) Following his release, plaintiff was treated with various medications, including Epogen. (Pl.'s Dep. at 193; Kaplan Decl. Ex. A at 57-59.) Plaintiff's physical limitations have remained the same since before his hospitalization. (Pl.'s Dep. at 196.) Plaintiff's current health is stable and he has been approved for a kidney transplant. (Pl.'s Dep. at 219; Goldfarb Decl. at ¶ 14; Mitchell Decl. Ex. A at 89-91.)

On December 1, 2003, plaintiff timely filed his complaint in this action. With the court's permission, plaintiff filed an amended complaint on June 22, 2004, alleging violations of the constitutional prohibition against cruel and unusual punishment and guarantee of due process of the law. U.S. Const. amend. VIII, XIV. Defendants joined issue on July 14, 2004. After the completion of discovery, defendants filed motions for summary judgment.

## Discussion

Because plaintiff is a *pro se* litigant, the court, in deciding this motion, has construed plaintiff's papers broadly, interpreting them to raise the strongest arguments they suggest. *Weixel v. Bd. of Educ. of the City of New York*, 287 F.3d 138, 146 (2d Cir. 2002). However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1993). In addition, because plaintiff objects to Judge Bloom's R&R, the court applies a *de novo* standard of review to the R&R. *See* Fed. R. Civ. P. 72

(b); 28 U.S.C. § 636(b).

## I. No Genuine Issue of Fact Exists

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion, the court must view any disputed information in the light most favorable to the nonmoving party. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 457, 112 S. Ct. 2072, 2076–77, 119 L. Ed. 2d 265 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)). Summary judgment is inappropriate if there is "any evidence in the record from any source from which a *reasonable* inference could be drawn in favor of the nonmoving party" regarding a genuine issue of material fact. St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000) (emphasis added). However, the nonmoving party cannot rely on "[c]onclusory allegations, conjecture, and speculation," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Plaintiff objects to the portion of MJ Bloom's R&R that relies on contemporaneous medical records in stating that plaintiff's blood pressure was checked upon his arrival at "emergency sick call" on June 4, 2003. *See* Pl.'s Objections at 2. Plaintiff contends that because the defendants had sole custody and control of the records, the records are unreliable and a genuine issue of fact exists as to whether defendant Mitchell checked plaintiff's vital signs upon plaintiff's arrival at "emergency sick call." *Id.* However, plaintiff does not set forth any facts or provide any evidence

5

to support his allegation that the records are unreliable.[3] Although plaintiff claims he can present "witnesses to support his claim that his vital signs were not taken," he has not provided any witness affidavits or even information about such witnesses, including name, title/occupation, their involvement in any events leading to plaintiff's hypertensive crisis on June 4, 2003 or such witnesses' prospective testimony. Plaintiff cannot rely on mere conclusory allegations or speculation to survive summary judgment. *See Kerzer*, 159 F.3d at 400.

## II. Leave to Amend Complaint

Construed liberally, plaintiff's objections appear to contend that MJ Bloom should have granted him leave to amend his complaint. *See* Pl.'s Objections at 3. MJ Bloom granted plaintiff's request to amend his complaint in June 2004 and plaintiff filed an amended complaint. Thereafter, plaintiff did not move to amend his complaint a second time. MJ Bloom is not under an obligation to grant plaintiff leave to amend his complaint *sua sponte*. *See Horoshko v. Citybank*, 373 F.3d 248, 249-50 (2d Cir. 2004) ("Because an amendment is not warranted absent some indication as to what appellants might add to their complaint in order to make it viable, the District Court was under no obligation to provide the Horoshkos with leave to amend their complaint much less provide such leave *sua sponte*.") (internal quotations omitted).

Nevertheless, permitting plaintiff to amend his complaint a second time would be futile. *See Goldberg v. Cablevision Systems Corp.*, 281 F. Supp. 2d 595, 605 (E.D.N.Y. 2003) ("If an

---

[3] Plaintiff cites *United States v. Robinson*, 544 F.2d 110. 115 (2d Cir. 1976) in support of his contention that the medical records are unreliable. *Robinson* deals with the admissibility of unemployment records at trial. The *Robinson* court held that the district court erred in allowing a witness to testify to the trustworthiness of records that are otherwise admissible under a hearsay exception. Here, plaintiff does not object to the admissibility of the medical records; thus, the *Robinson* case is inapplicable.

amendment is futile, it is not an abuse of discretion to deny leave to amend") (citing *Ruffollo v. Oppenheimer & Co.*, 987 F.2d 129,131 (2d Cir. 1993)). Plaintiff fails to articulate any substantive rationale or authority indicating that an amendment to his complaint that would help him survive summary judgment. *See Horoshko*, 373 F.3d at 249-50; *see also Goldberg*, 281 F. Supp. 2d at 605 (finding that "an amendment to the complaint would be futile as the plaintiff fails to cite to any authority showing that the rules and procedures for the use of the public access channel infringe his First Amendment right to freedom of speech.")

### III. Appointment of Counsel

Plaintiff contends that MJ Bloom improperly denied "plaintiff's request for the discretionary assignment of counsel, after Mr. Braunsberg[4] was relieved." (Pl.'s Objection at 3.) As indicated in the R&R, MJ Bloom found that plaintiff did not meet the threshold for pro bono counsel under *Ferrelli v. River Manor Health Care Ctr*, 323 F.3d 196 (2d Cir. 2003). (MJ Bloom R&R at 11.) This Court agrees.

The Sixth Amendment right to counsel does not extend to civil litigants. *See Martin-Trigona v. Lavien*, 737 F.2d 1254, 1260 (2d Cir. 1984). However, pursuant to 28 U.S.C. § 1915(e)(1), "[t]he court may request an attorney to represent any person unable to afford counsel." "Whether appointment of counsel is necessary rests with the discretion of the court." *Martin-Trigona*, 737 F.2d at 1260. In deciding whether to appoint counsel, the court must first determine whether plaintiff can afford to obtain counsel. *See Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341

---

[4] Plaintiff retained Mr. Michael Braunsberg sometime after August 6, 2004, when MJ Bloom set the discovery deadline for October 26, 2004. On May 4, 2005, Mr. Braunsberg requested to be relieved as counsel at plaintiff's direction. Mr. Braunsberg was terminated as counsel on May 19, 2005.

(2d Cir.1994). If the court finds that a plaintiff cannot afford counsel, it must then examine the merits of the case and determine whether the indigent's position "seems likely to be of substance." *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir.1986). "Counsel is often unwarranted where the indigent's chances of success are extremely slim." *Ferrelli*, 323 F.3d at 204. After the two threshold determinations are made, the court has discretion to consider the following factors: (1) the indigent's ability to investigate crucial facts; (2) whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder; (3) the indigent's ability to present the case; (4) the complexity of the legal issues involved; and (5) any special reason in that case why appointment of counsel would be more likely to lead to a just determination. *Id.* at 61-62.

Here, plaintiff has not demonstrated that he is unable to afford counsel. In fact, plaintiff retained counsel on his own, but later voluntarily relieved counsel. Thereafter, plaintiff did not move for appointment of counsel. Thus, plaintiff has only demonstrated that he is able to afford counsel.

Nonetheless, MJ Bloom did not abuse her discretion in denying plaintiff appointment of counsel because plaintiff's claims are not "of substance" and plaintiff's "chances of success are extremely slim." *See Hodge*, 802 F.2d at 61-62; *Ferrelli*, 323 F.3d at 204. The crux of plaintiff's claim is that Defendant Kaplan did not adequately monitor the effects of Epogen and adjust or "hold" that drug accordingly, causing plaintiff's hypertensive crisis on June 4, 2003 and that Defendant Mitchell failed to both adequately supervise Kaplan during plaintiff's treatment and treat plaintiff promptly when he reported to Arthur Kill's "emergency sick call" on June 4, 2003. Plaintiff's medical records reveal that plaintiff's blood pressure was taken at regular intervals during dialysis treatment and when he reported to "emergency sick call" on June 4, 2003. (*See* Mitchell

8

Decl. Ex. A at 14-15; Kaplan Ex. A. at 6-23.) Moreover, plaintiff dosages of Epogen were routinely monitored, which is evidenced by Kaplan's frequent modification or "holding" of Epogen treatment. (*See* Kaplan Decl. at ¶ 18.) As Plaintiff's medical records confirm and MJ Bloom correctly points out, plaintiff received not only "some care," but more than "some care;" thus, he is extremely unlikely to succeed on his § 1983 claim. *See Evants v. Bonner*, 196 F. Supp. 2d 252, 257 (E.D.N.Y. 2002) (where plaintiff received some care, the inadequacy or impropriety of the care will not support an Eighth Amendment claim.)

In addition, plaintiff's contentions that his claims are "counsel worthy" pursuant to *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997) are without merit. Moreover, unlike in *Hendricks*, plaintiff has demonstrated, in both his motion papers and objections to MJ Bloom's R&R, a keen ability to present his case and to understand the issues involved. MJ Bloom pointed out that plaintiff "exhibited a particularly keen understanding of both his responsibility and the Court's procedures throughout the course of this litgation, specifically including his obligations under Rule 56 as well as the possible consequence of failing to meet those obligations." *See* R&R at 10. In addition, plaintiff completed a legal research course and is assigned to the inmate law library where he continues to gain valuable litigation experience and assistance from more senior clerks. *See* R&R at 11. Finally, plaintiff submitted an adequate Rule 56.1 statement, Affirmation in Opposition and well-drafted memorandum of law and objections to MJ Bloom's R&R, citing to the record and to case law. Thus, plaintiff has not met the threshold for pro bono counsel under *Ferrelli* and MJ Bloom appropriately denied plaintiff appointment of counsel.

## **Conclusion**

After *de novo* review of those portions of the R&R to which Tolentino objects and for the reasons set forth above, the court adopts Judge Bloom's R&R in its entirety. Defendants' motion for summary judgment is granted and this matter is dismissed without costs to either party.

SO ORDERED.

DATED:      Brooklyn, New York
                June 14, 2006

                                                                       /s/
                                              DORA L. IRIZARRY
                                      United States District Judge